NOT FOR PUBLICATION          [Dkt. Items 164, 165, 175 and 187]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

CLIFFORD J. LEVINE

               Plaintiff,

    v.

VOORHEES BOARD OF EDUCATION,

              Defendant.

Civil No. 07-1614 (RMB)

**OPINION**

Appearances:

      William B. Hildebrand
      Law Offices of William B. Hildebrand, LLC
      1040 Kings Highway North
      Suite 601
      Cherry Hill, NJ 08034
          Attorney for Plaintiff

      William S. Donio
      Cooper Levenson April Niedelman & Wagenheim, P.A.
      1125 Atlantic Avenue, Third Floor
      Atlantic City, NJ 08401-4891
         Attorney for Defendant Voorhees Board of Education

**BUMB**, United States District Judge:

## I.    Introduction

Plaintiff Clifford J. Levine (the "Plaintiff") was an Assistant Principal/Supervisor at Osage Elementary School for the 2004-2005 school year.  On March 9, 2005, the Voorhees Township Police removed Plaintiff from the school because he was crawling on the ground in front of students.  On May 5, 2005, the school informed him that it would not renew his employment contract as

an Assistant Principal.  The school did, however, offer Plaintiff a teaching position at Voorhees Middle School, where he teaches currently.

On April 5, 2007, Plaintiff filed a Complaint alleging violations of the Family and Medical Leave Act[1] ("FMLA"), 29 U.S.C. §§ 2601-2654 and New Jersey's Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. §§ 10:5-1 to -49.  Defendant Voorhees Township Board of Education ("the Board" or "the Defendant") now moves for summary judgment as to the NJLAD claim, the remaining claim [Docket No. 165].  Plaintiff moves for summary judgment on the propriety of certain affirmative defenses raised by Defendant [Docket No. 175].  Both parties filed motions to seal documents submitted in support of their respective motions [Docket No. 164 and 187].  For the following reasons, Defendant's Motion for Summary Judgment is denied, and Plaintiff's Motion for Summary Judgment Dismissing Certain Affirmative Defenses is denied.  The parties' respective Motions to Seal are granted, in part.

## II.  Background

Plaintiff's claims against the Board arise out of the non-renewal of his employment contract for the Assistant Principal/Supervisor position at Osage Elementary School

---

[1]   Although the FMLA claims were dismissed by Consent Order on August 6, 2009 [Docket No. 160], the Court elected to exercise supplemental jurisdiction over Plaintiff's state law claims [Docket No. 159].

(hereafter "Osage").  The facts, as derived from the parties'
Rule 56.1 Statements, are set forth below.  See L.Civ.R. 56.1(a).

**A.   Plaintiff's Employment Qualifications**

Upon graduating from Towson State University in January,
1995, Plaintiff began teaching third grade in Parkville,
Maryland.  Plaintiff's Counter Statement of Undisputed Facts
(hereafter "Pl. Counter SOF") ¶¶ 1-2; Defendant's Response to
Plaintiff's Counter Statement of Facts (hereafter "Def. Response
SOF") ¶¶ 1-2.  From September 1995 to June 1997, Plaintiff worked
as a substitute teacher for the Medford and Mount Laurel School
Districts in New Jersey.  Pl. Counter SOF ¶ 3; Def. Response ¶ 3.
Plaintiff began teaching seventh grade math in 1997 at Galloway
Township School District.  Pl. Counter SOF ¶ 4; Defendant's
Statement of Facts (hereafter "Def. SOF") ¶ 1.

On April 18, 2000, Plaintiff applied for a teaching position
at Voorhees Middle School.  Def. SOF ¶ 2; Plaintiff's Response
Statement of Facts (hereafter "Pl. Response SOF") ¶ 2.  Samuel
Citron, the former principal of Voorhees Middle School,
recommended Plaintiff for the "Math/Social Studies Teacher"
position.  Def. SOF ¶ 3; Pl. Response SOF ¶ 3.  Plaintiff
accepted a contract for the position on or about May 26, 2000.
Def. SOF ¶ 4; Pl. Response SOF ¶ 4.  Plaintiff continued in this
position through 2004 and obtained tenure.  Def. SOF ¶¶ 5-6; Pl.
Response SOF ¶¶ 5-6.  While working at Voorhees Middle School,

Plaintiff received his Masters degree in School Leadership from Wilmington College in Delaware.  Pl. Counter SOF ¶ 1; Def. Response SOF. ¶ 1.

> **B.    Plaintiff's Performance as Assistant Principal/Supervisor**

On June 8, 2004, Plaintiff applied for the Assistant Principal/Supervisor position at Osage.  Def. SOF ¶ 6; Pl. Response SOF ¶ 6.  Frances Collins, Assistant Superintendent for Voorhees Township Public Schools, "very strongly recommended" Plaintiff for the position.  Def. Ex. F in Support of Summ. J. at 36:8-9.  Plaintiff was offered a ten-month position as Assistant Principal/Supervisor at Osage for the 2004-2005 school year on August 2, 2004.  Def. SOF ¶ 9; Pl. Response SOF ¶ 9.  Two days later, the Voorhees Board of Education offered Plaintiff a contract for the 2004-2005 school year.  Def. SOF ¶ 10; Pl. Response SOF ¶ 10.  Plaintiff began work in August 2004.  Pl. Response SOF ¶ 10.

> **1.    Plaintiff's First Performance Appraisal**

Plaintiff received his first performance appraisal on November 19, 2004, approximately three months after he began work as the Assistant Principal of Osage.  Def. SOF ¶ 11; Pl. Response SOF ¶ 11.  Diane Young, Principal at Osage, completed the Supervisor Performance Appraisal for Plaintiff.  Id.  She graded Plaintiff as a "three," or "proficient," the highest level

4

available, in all areas evaluated.[2]  Pl. Ex. G in Opposition to

Summ. J.  Ms. Young made the following comments in her report:

> [Plaintiff] has transitioned from Middle School teacher
> to assistant principal/district supervisor without
> difficulty.  He has worked extremely hard to build
> positive relationships with the staff, parents, and
> students at Osage Elementary School.  In addition he is
> more knowledgeable of the building routines and
> elementary curriculum due to his commitment to learning
> about Osage through research and discussions with the
> entire Osage community.  His efforts in this area are
> commendable and appreciated by all.
>
> During the first marking period, [Plaintiff] has
> observed classes and written teacher evaluations.  He
> organized data from the New Jersey Ask in order to
> assist teachers and this administrator make
> improvements in instruction.  This also helped teachers
> evaluate the needs of their individual students.
> [Plaintiff] has begun to conduct morning training
> sessions in the area of differentiated instruction and
> math.  These sessions are popular with staff and have a
> positive [e]ffect on teachers' ability to effectively
> deliver instruction.  [Plaintiff's] monthly surveys to
> help improve communication between maintenance staff
> and teachers have been valuable.  Finally, [Plaintiff]
> has effectively worked with many students and parents
> in order to help them solve problems and has supported
> students who need extra attention during the day.  Keep
> up the excellent work!
>
> In order to fulfill his district responsibilities,
> [Plaintiff] led a workshop in the area of Science.  He
> worked with teachers to help them create practice
> Science open-ended questions to use in their
> instruction.  He also shared research to help teachers
> prepare students for the Science portion of the New
> Jersey Ask.

---

[2]     Plaintiff was apparently not evaluated in three categories,
"Participates as a member of textbook selection committees,"
"Advises the principal on class loads and teacher assignments,"
and "Performs demonstration lessons with students in classroom
situations," for which the notation "N/A" was marked on the
Performance Appraisal.

> It has been a pleasure to work collaboratively with [Plaintiff]. He is an asset to the Osage School staff and I look forward to working together in the future.

Id. The report also indicates that Ms. Young would be meeting with Plaintiff to review the evaluation.   Id.

Plaintiff admits that he spoke with Ms. Young in November 2004 about his evaluation of a teacher. Def. Ex. J in Support of Summ. J. at 19:25-20:6. Specifically, Plaintiff testified that subsequent to the November 2004 evaluation, Ms. Young and Ms. Collins "together agreed [Plaintiff] need[ed] to work on [his] evaluations." Pl. Ex. S in Opposition to Summ. J. (Oct. 29, 2008 Dep.) at 179:12-19. Plaintiff received an e-mail from Ms. Collins on December 1, 2004 stating that Ms. Collins "had a chance to review [Plaintiff's] recent evaluation report," that the report "provide[d] much mor[e] information to the teacher" and told Plaintiff to "keep up the good work!" Pl. Ex. AA in Opposition to Summ. J.

Ms. Young, however, testified the she became concerned about Plaintiff's performance as Assistant Principal "[s]ome time after December" when she began noting "that [Plaintiff] was having difficulties." Def. Ex. I in Support of Summ. J. at 86:18-19.

## 2.   Plaintiff's Second Performance Appraisal

Notwithstanding this, Ms. Young's concerns were not captured in the Principal Residency Program - Formative Evaluation Form she completed for Plaintiff on January 6, 2005. Pl. Ex. I in

6

Opposition to Summ J.   In this evaluation, Ms. Young commented that "[Plaintiff] has evaluated staff from different grade levels that teach a variety of different subjects.   In order to continue to improve in this area, [Plaintiff] has ordered materials to research evaluation and observation techniques." Id.  Ms. Young noted that community relations "is an area of strength for [Plaintiff].  He does an outstanding job building relationships with teachers, staff and children." Id.  The evaluation also states that Plaintiff's "attendance at every parent group event has helped him to establish himself within the community" and that Plaintiff "handle[ed] discipline concerns frequently and effectively." Id.

In the section of the evaluation titled "Overall Strengths/Developmental Needs," Ms. Young made the following comments:

> [Plaintiff] has worked hard to develop a positive relationship with the entire Osage School community. He has earned the respect of the staff, parents and students.  He is understanding and respectful in all situations.  His efforts to continue the morning training sessions deserves praise as well as his initiative to expand his knowledge by attending workshops and training sessions.  His work to help prepare teachers for the Science portion of the state test was helpful.  The cleanliness of the building has improved due in part to [Plaintiff's] monthly communications.  He is continuing to learn about the operation and management of an elementary school.

<u>Id.</u>  Ms. Young concluded her evaluation by stating that "[i]t has been a pleasure thus far working with [Plaintiff].  He is making good progress."  <u>Id.</u>

Once again, his second Supervisor Performance Appraisal, dated January 10, 2005 and which incorporated the comments made on Plaintiff's Principal Residency Program Evaluation, reflected a "three," or "proficient," the highest level available, in all areas evaluated.[3]  Pl. Ex. H in Opposition to Summ. J.

Although Ms. Young testified that these evaluations of Plaintiff were accurate and "complete," she also testified that she "did not list any weaknesses."  Def. Ex. I in Support of Summ. J. at 76:7-15; 88:4-7.  Ms. Young explained that Plaintiff and she "were partners, and [she] felt strongly that it was very important for [them] to build a positive rapport; and it [wa]s more [her] style to address concerns face to face and not put them in writing."  <u>Id.</u> at 76:17-21.

### 3.  Concerns about Plaintiff's Performance

In contrast to the written, superior evaluations, Plaintiff's supervisors, particularly Ms. Young, testified that they had concerns about Plaintiff's work as Assistant Principal/Supervisor.

---

[3]    Plaintiff was apparently not evaluated in two categories, "Advises the principal on class loads and teacher assignments" and "Performs demonstration lessons with students in classroom situations for observation by teachers," for which the notation "N/A" was marked on the Performance Appraisal.

### a.   Principal Young's Testimony

Ms. Young testified that Plaintiff "was asked to begin the responsibility of completing a staff evaluation; and there were ones that he didn't do that he had to be reminded to complete." Def. Ex. I in Support of Summ. J. at 14:15-20.  Ms. Young "asked [Plaintiff] to take initiative to create responsibilities that he felt he could take on and not just copy what had been done in the past" but said Plaintiff "was never able to do that."  Id. at 15:15-21.  She felt that he

> couldn't produce anything that was original.  So, for example, if you looked at his evaluations that he wrote, they're written very similar to the way that I had written the evaluations.  They weren't his own.  When I asked him to create his own style, he then reviewed other administrators' evaluations and then proceeded to copy another administrator's format.
> . . .
> My problem with that is that I was looking – the staff needed to be able to hear a different prospective [sic] in regards to their lessons so that they could be better.  So I have - would expect an assistant principal to be able to add to what is already happening, not just copy it, or to make it better.

Id. at 16:2-21.  Ms. Young testified that during one of their weekly meetings, she told Plaintiff

> that he needed to take more initiative to create his own identity as an assistant principal in the building and that [she] wanted him to come to [her] and say:  These are the needs that we have, and to develop plans to make things better without me having to tell him to do that all the time.

Id. at 49:7-13.

Additionally, Ms. Young testified that Plaintiff failed to meet the deadline for teacher evaluations, which were typically completed by or about the first of March. Id. at 20:4-25. Ms. Young did not recall whether she spoke to anyone in the administration about the problems Plaintiff had with regard to completing evaluations. Id. at 41:4-7. Plaintiff testified that he was never told that he was not performing evaluations in a timely manner. Def. Ex. J in Support of Summ. J. at 19:13-16.

Ms. Young also felt that Plaintiff "wasn't a presence in the building, [that he] stayed in his office and waited for the problems to come to him instead of being out there looking to be proactive and solve the problems before they had occurred and gotten out of control." Def. Ex. I in Support of Summ. J. at 33:13-19. She "lacked confidence in [Plaintiff's] ability to lead in the building," and was concerned that Plaintiff "had difficulty remembering procedures in the event of an emergency" and that he "would ask staff members questions that he should have known the answers to." Id. at 26:17-27:10. It was reported to Ms. Young "that during one fire drill he actually asked an instructional associate where he was supposed to be during the drill. And [Ms. Young] was concerned about his knowing what to do in the event of an emergency if [she were] not in the building...." Id. at 27:20-25. Ms. Young could not recall when she received this report or who reported this information. Id.

10

at 28:4-18.  She met with Plaintiff weekly on Monday mornings
"and part of the meeting [they] reviewed emergency protocol, and
[Plaintiff] could not remember what to do repeatedly."  Id. at
27:25-28:3.

Plaintiff testified that he did not recall having any
discussions with Ms. Young regarding his performance during fire
drills.  Pl. Ex. S in Opposition to Summ. J. (Oct. 29, 2008 Dep.)
at 194:9-12.  Nor did Plaintiff recall ever asking anyone where
he was supposed to be stationed during a fire drill.  Id. at
194:16-19.

Ms. Young was also troubled by Plaintiff's failure to come
to work on a day that she told him she would not be in and that
he would be in charge of the building.  Def. Ex. I in Support of
Summ. J. at 30:24-31:4.  Ms. Young reported that Plaintiff "did
not come to work, and he didn't notify [her] that he wasn't
coming to work."  Id. at 31:2-4.  Ms. Young could not recall the
day or month in which this incident occurred but remembered that
it occurred prior to March 2005.  Id. at 31:5-22.  Plaintiff
denies ever being advised by Ms. Young that she would not be in
school where she made specific request that Plaintiff be in
school that day.  See Pl. Ex. S in Opposition to Summ. J. ( Feb.
12, 2009 Dep.) at 33:9-19.

Ms. Young also testified that "more and more teachers [were]
coming to [her] with their children's discipline concerns rather

than going to [Plaintiff] as time went on." Def. Ex. I in
Support of Summ. J. at 34:3-5. She specifically recalled "one
situation with a child that he was unable to solve that [she]
needed to then take over because he was unable to handle it."
Id. at 33:24-34:1. "[T]he mother [of the child] would call
frequently and [Plaintiff] had a hard time...communicating to her
that things needed to change or her child wasn't going to be able
to be successful in school." Id. at 34:11-15.

   Ms. Young found that Plaintiff "became obsessive about small
problems or responsibilities that inhibited him from really doing
his job." Id. at 39:19-21. She thought that Plaintiff "became
very focused on the cleanliness of the building, which was
something that [Ms. Young] asked Plaintiff to work on; but to the
extent that he focused on it was problematic." Id. at 40:11-14.
Sometime after January, Ms. Young noticed that Plaintiff's office
"was not professionally organized" and that "[h]e was interacting
with staff in a way that [she] felt was inappropriate, because he
was asking them for help with personal things." Id. at 41:13-18.
Ms. Young noted a lollipop in the thermostat of Plaintiff's
office, "some kind of quote...all over his office" and that
Plaintiff was moving furniture "in and out of the office on a
daily basis, so the original furniture was not there." Id. at
42:16-23. Plaintiff does not recall behaving in this manner; he

concedes that if he did, then the behavior was a product of his
mental illness.  Pl. Response SOF ¶ 17.

Ms. Young testified that Plaintiff "asked for rides home,
and wanted [the staff] to take him food shopping."  Def. Ex. I in
Support of Summ. J. at 44:8-17.  However, Plaintiff testified
that the only time he asked a staff member for a ride was on
March 8, 2005 and that the person he asked was someone who lived
close by and with whom he was friendly.  Pl. Ex. S in Opposition
to Summ. J. at 48:8-49:25.

Ms. Young felt that Plaintiff "had poor decision-making
abilities" and "made poor choices in how to handle situations."
Def. Ex. I in Support of Summ. J. at 53:16-18; 55:18-19.  Ms.
Young told Plaintiff around January or February that she wanted
to meet with him more often to mentor him.  Pl. Ex. S in
Opposition to Summ. J. (Oct. 29, 2008 Dep.) at 192:7-17.
Plaintiff explained that the two "weren't seeing each other...too
frequently September to December.  So in [the] January, February
period, I guess she started seeing a difference, and she wanted
to see me more often to make sure I was doing a good job."  Id.
at 192:17-21.

On February 24, 2005, Ms. Young sent Plaintiff an e-mail
complementing him on a training session where he "generated good
discussions about teaching math effectively."  Pl. Ex. J in

13

Opposition to Summ. J.  Ms. Young told Plaintiff to "[k]eep up the good work!"  Id.

However, Ms. Young was not satisfied with Plaintiff's performance when he failed to give a presentation at a faculty meeting as she had instructed.  Def. Ex. I in Support of Summ. J. at 13:13-14:7.  Ms. Young "confront[ed] [Plaintiff]...after the faculty meeting, and he didn't really have a reason" for failing to give the presentation.  Id. at 14:8-12.  Plaintiff acknowledged his failure to give the presentation "and apologized [to Ms. Young] for not performing [his] duty."  Def. Ex. N. in Support of Summ. J. at 40:13-14.  Ms. Young could not recall the date of the faculty meeting but believed it occurred sometime after the first of the year.  Def. Ex. I in Support of Summ. J. at 13:15-20.  Plaintiff dates the faculty meeting as occurring on March 7, 2005, two days before his psychotic episode described below.  Def. Ex. N in Support of Summ. J. at 32:16-19.

Ms. Young shared her concerns about Plaintiff with the school administration.  Def. Ex. I in Support of Summ. J. at 40:20-23.

### b.  Director Mattie's Testimony

Daniel Mattie, Director of Program Development for the Board, testified that Plaintiff failed to properly orchestrate science curriculum.  Def. SOF at ¶ 19; Pl. Response SOF ¶ 19. Mr. Mattie described Plaintiff's role as "coordinat[ing] the

review of the curriculum guide and the potential purchase of a new textbook, if we decided we were going to go that direction." Def. Ex. K in Support of Summ. J. at 9:6-9. Mr. Mattie dropped off science kits for Plaintiff to distribute in January 2005, but when Mr. Mattie returned one month later the kits "were on the floor in the exact place they were...[t]hey hadn't been disseminated to the teachers at all." Id. at 10:3-10:19.

Plaintiff alleges that the incident occurred in February, not January. Pl. Response SOF ¶¶ 19-20. He recalled being tasked with distributing the science kits and spoke to some of the teachers about the kits, as well as reviewed the kits himself. Def. Ex. L in Support of Summ. J. at 194:20-195:21. However, Plaintiff acknowledged that Mr. Mattie's "specific direction was to see if the teachers were interested in this particular publisher to see if these books would be good for next year." Id. at 196:10-12. Plaintiff further acknowledged that he did not "follow the directions correctly. I didn't have the teachers look over the books." Id. at 197:18-20.

### c. Assistant Superintendent Collins's Testimony

Ms. Collins was aware of concerns about Plaintiff's performance as Assistant Principal/Supervisor at Osage and "by January of [2005], [she] realized that it was a mistake to have [Plaintiff] in the position of assistant principal." Pl. Ex. F in Opposition to Summ. J. at 34:6-8. Ms. Collins explained that

15

> [a] decision about renewing a non-tenured person
> depends on an ongoing formal and informal assessment of
> job performance and that really is done in the context
> of reviewing information, feedback from the direct
> supervisor, my own personal observations, and if [she]
> were in doubt, [she] would ask is this someone that
> you're recommending for renewal.  In [Plaintiff's]
> case, there were many conversations of how is he doing,
> and I really was not in doubt as what [Ms. Young's]
> assessment as his direct supervisor was based on the
> feedback that she provided to me.

Def. Ex. F in Support of Summ. J. at 31:7-18.  Ms. Collins

acknowledged that she "was not in doubt that [Plaintiff's] job

performance was not to the point that would have been acceptable

in our district," and she "was convinced that contract renewal

was not appropriate at that time."  Id. at 32:1-7.

Plaintiff met with Ms. Collins on March 8, 2005, one day

prior to his psychotic episode, described below.  Def. Ex. N in

Support of Summ. J. at 32:1-6.  Although Plaintiff could not

recall their conversation, he did remember that they spoke about

his failure to give the scheduled presentation at a faculty

meeting.  Id. at 32:9-19.

### d.   Superintendent Brosel's Testimony

Raymond Brosel, Superintendent for Voorhees Township Public

Schools, was also aware of concerns about Plaintiff's

performance.  Def. SOF ¶ 24; Pl. Response SOF ¶ 24.  He recalled

Ms. Young telling him that "she would work on strategies, give

him assignments that he could function and accomplish to the

betterment of the school, and she was also working with him on

16

his teacher evaluation process." Def. Ex. M in Support of Summ.
J. at 100:3-7. Ms. Young also told Mr. Brosel that "[s]he was
concerned about [Plaintiff's] decision-making process. She
wasn't sure how he would react in certain situations. She was
concerned about his ability to garner support from the staff."
Id. at 101:1-4. Mr. Brosel recalled Ms. Young first raising
concerns about Plaintiff in the "winter time frame," sometime
between December and February. Id. at 101:17-23.

  **C. The March 9, 2005 Incident**

  On March 9, 2005, the Voorhees Township Police removed
Plaintiff from Osage because he was crawling on the ground and
polishing his superiors' shoes. Def. SOF ¶ 42; Pl. Response SOF
¶ 42. Plaintiff was cleaning the cafeteria by crawling on the
floor picking up pieces of paper and crawling down the hallway as
students were walking past him. Def. SOF ¶ 43; Pl. SOF ¶ 43.

  When medical staff arrived to assist Plaintiff, he resisted
"[v]erbally, and at the door of his office he clearly indicated
he wasn't leaving the office." Def. Ex. M in Support of Summ. J.
at 42:3-6. Plaintiff denies that he "physically" resisted
medical assistance. Pl. Response SOF. ¶ 44. Plaintiff was taken
by ambulance to Kennedy Hospital, where he spent the night in the
crisis section of the hospital emergency area. Def. SOF ¶ 45;
Pl. Response SOF ¶ 45. Plaintiff left the hospital the next
morning. Pl. Response SOF ¶ 45.

Two days later, on March 11, Plaintiff's father called Mr. Brosel to warn him that Plaintiff intended to return to work. Pl. Ex. W in Opposition to Summ. J. at 120:24-121:14.  Mr. Brosel, together with other administrators and a police officer, met Plaintiff in the parking lot and advised Plaintiff that he could not return to work.  Pl. Counter SOF ¶ 26; Def. Ex. O in Support of Summ. J.  Plaintiff asked for some personal items from his office and left the school without further incident.  Id.

### D. Plaintiff's Medical Leave

After Mr. Brosel met Plaintiff in the school parking lot, Mr. Brosel contacted Plaintiff's father and discussed Plaintiff's need for help.  Pl. Counter SOF ¶ 27.  Plaintiff's father testified that during this conversation, he used the term "chemical imbalance, words to that effect."  Pl. Ex. W in Opposition to Summ. J. at 125:22-24.  Plaintiff's father called Mr. Brosel two or three days later and advised Mr. Brosel that Plaintiff could not be located.  Pl. Counter SOF ¶ 28.  During this conversation, Plaintiff's father again stated his belief that Plaintiff was suffering from a chemical imbalance and that the condition could be treated.  Id.  Plaintiff's father testified that Mr. Brosel responded by stating "at least he has tenure as a teacher."  Pl. Ex. W in Opposition to Summ. J. at 138:1-4.

18

On March 14, Mr. Brosel sent Plaintiff a letter informing him that he had been placed on medical leave.  Def. Ex. Q in Support of Summ. J.  Plaintiff was instructed that he must undergo psychiatric evaluation before he could return to work and cautioned that the Board might require its own evaluation.  Id. This letter also directed Plaintiff not to enter school grounds. Id.

Plaintiff was evaluated by Dr. Alan Gruenberg.  Def. SOF ¶ 52; Pl. Response SOF ¶ 52.  On April 6, Mr. Brosel wrote to Dr. Gruenberg asking for an "assessment, evaluation, diagnosis and an estimate of when [Plaintiff] can return to work."  Def. Ex. U in Support of Summ. J.  Dr. Gruenberg's reply stated that Plaintiff was capable of returning to work on April 14, 2005.  Def. SOF ¶ 55; Pl. Response SOF ¶ 55.  A second letter from Dr. Gruenberg to Mr. Brosel stated again that Plaintiff was fit to return to work and that Plaintiff had "experienced an Acute Stress Disorder." Def. Ex. W in Support of Summ. J.  The letter further indicated that Plaintiff's symptoms had been complicated by "high-dose oral and inhaled cotricosteroids as well as zolpidem (Ambien) for insomnia, associated with [Plaintiff's] asthma and its treatment."  Id.  Dr. Gruenberg reported that Plaintiff "has been adherent to all psychiatric treatment recommendations" and "has recovered from the Acute Stress Disorder."  Id.  Dr. Gruenberg

concluded his letter by stating that Plaintiff's "emotional and physical health is excellent." Id.

On April 21, 2005, Plaintiff's counsel wrote to the Board's attorney indicating Plaintiff's desire to return to work. Def. SOF ¶ 60; Pl. Response SOF ¶ 60. Five days later, Ms. Collins sent Plaintiff a letter notifying him that a recommendation to terminate his employment as Assistant Principal/Supervisor would be discussed at the Board of Education meeting scheduled for May 4. Def. SOF ¶ 61; Pl. Response SOF ¶ 61. Prior to this meeting, Mr. Brosel submitted a memorandum to the Board stating his recommendation that Plaintiff's contract not be renewed. Def. SOF ¶ 62; Pl. Response SOF ¶ 62. Mr. Brosel listed the following reasons for his recommendation: "Lack of demonstrated leadership skills[;] Failure to establish an educational leadership presence[;] Failure to follow through on specific assignments[;] Poor to not existent decision making abilities[.]" Def. Ex. Z in Support of Summ. J.

**E.   Plaintiff's Assistant Principal Contract Was Not Renewed**

On May 5, 2005, Mr. Brosel informed Plaintiff that his Assistant Principal/Supervisor contract would not be renewed. Def. SOF ¶ 65; Pl. Response SOF ¶ 65. Mr. Brosel sent Plaintiff a second letter, also dated May 5, notifying Plaintiff that he was approved for re-employment as a teacher. Def. SOF ¶ 70; Pl. Response SOF ¶ 70. That same day, Ms. Collins informed Plaintiff

20

that the Board approved Plaintiff for sick leave through June 30, 2005 unless Plaintiff was medically cleared to return to work at an earlier date.  Def. SOF ¶ 66; Pl. Response SOF ¶ 66.  The Board offered Plaintiff the opportunity to return to work as Assistant Principal for the remainder of the school year, but he declined.  Def. SOF ¶ 67; Pl. Response SOF ¶ 67.

Mr. Brosel testified that the March 9, 2005 incident was not a factor in the decision not to renew Plaintiff's contract as Assistant Principal/Supervisor.  Def. Ex. M in Support of Summ. J. at 102:8-13.  Plaintiff disputes this contention, pointing to the testimony of Robert Cranmer, who succeeded Plaintiff in the role of Assistant Principal and who reported being told that Plaintiff left because of "some type of problem...[m]ore in the mental nature."  Pl. Ex. T in Opposition to Summ. J. at 7:12-16; 27:18-24.

On the same day that the school sent letters to Plaintiff regarding his employment, Mr. Brosel also wrote to Dr. Alan Miller asking Dr. Miller to examine Plaintiff and evaluate whether Plaintiff should return to work.  Def. SOF ¶ 71; Pl. SOF ¶ 71.  Dr. Miller rendered a report on May 24 in which he found "no current psychiatric reason why [Plaintiff] could not return to work as a school administrator (aside from any current limitations in his administrative competence), or why he could

21

not return to work as a teacher...."  Def. Ex. FF in Support of
Summ. J.

On June 15, Mr. Brosel wrote to Plaintiff scheduling a
meeting to facilitate Plaintiff's return to work.  Def. SOF ¶ 79;
Pl. Response SOF ¶ 79.  At the meeting, Mr. Brosel conveyed the
Board's offer to Plaintiff to return as Assistant Principal for
what remained of the school year and to continue his employment
thereafter as a teacher.  Def. SOF ¶ 80; Pl. Response SOF ¶ 80.
Plaintiff testified that when he was informed that his superiors
"were going to assign me this minimal job over at the
administration building" and because he "wasn't going to be
returning to the elementary school," Plaintiff requested, and was
granted, leave for the remainder of the month.  Pl. Ex. S in
Opposition to Summ. J. (Feb. 12, 2009 Dep.) at 59:1-7.

Plaintiff returned to work as a tenured teacher at Voorhees
Middle School.[4]  Def. SOF ¶ 85; Pl. Response SOF ¶ 85.

_____

[4]    Defendant's Rule 56.1 Statement contained facts relating to
incidents that occurred after Plaintiff returned to work as a
tenured teacher.  Plaintiff objects that such facts are
irrelevant and immaterial to the Board's decision not to renew
Plaintiff's contract for the Assistant Principal/Supervisor
position.  The Court agrees.  "Put simply, the after-acquired
evidence rule proscribes a defendant alleged to have unlawfully
discriminated against a plaintiff from introducing evidence which
the defendant did not know about at the time it took the adverse
action in order to escape liability."  Bowers v. Nat'l Collegiate
Athletic Ass'n, 563 F.Supp.2d 508, 527 (D.N.J. 2008) (citing
McKennon v. Nashville Banner Pub. Co., 513 U.S. 352,
359-60(1995); Mardell v. Harleysville Life Ins. Co., 31 F.3d
1221, 1228 (3d Cir.1994), abrogated by McKennon, 513 U.S. at 359-
60).  Accord Cicchetti v. Morris County Sheriff's Office, 194

III.      **Summary Judgment Motions**[5]

Defendant moves for summary judgment in its favor.

Plaintiff moves for summary judgment dismissing certain

affirmative defenses.

---

N.J. 563, 589 (2008) (recognizing that after-acquired evidence is not relevant to the question of liability under NJLAD).

[5]      Both parties have moved to seal information about Plaintiff's medical condition [Docket Items 164 and 187].   "It is well-settled that there exists, in both criminal and civil cases, a common law public right of access to judicial proceedings and records."   In re Cendant Corp., 260 F.3d 183, 192 (3d Cir. 2001) (citing Littlejohn v. BIC Corporation, 851 F.2d 673, 677-78 (3d Cir. 1988)).   Local Rule 5.3 "govern[s] any request by a party to seal, or otherwise restrict public access to, any materials filed with the Court or utilized in connection with judicial decision-making."   L.Civ.R. 5.3(a)(1).   Local Rule 5.3(c)(2) requires the moving party to establish:

> (a) the nature of the materials or proceedings at issue, (b) the legitimate private or public interests which warrant the relief sought, (c) the clearly defined and serious injury that would result if the relief sought is not granted, and (d) why a less restrictive alternative to the relief sought is not available.

Both parties maintain that the disclosure of information about Plaintiff's medical condition would cause Plaintiff to suffer a clearly defined and serious injury.   Courts have repeatedly found a person's medical records to be private.   Doe v. Delie, 257 F.3d 309, 315 (3d Cir. 2001) ("We have long recognized the right to privacy in one's medical information...."); United States v. Westinghouse Elec. Corp., 638 F.2d 570, 577 (3d Cir. 1980) ("There can be no question that... medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection."); Skinner v. Ashan, 04-2380, 2007 WL 708972 (D.N.J. March 2, 2007).   Accordingly, the Court will grant both Motions to Seal.

Although the Court will grant the Motions to Seal, the parties shall, within thirty days, re-file their exhibits redacting only the specific portions relating to Plaintiff's medical information.

A.      Defendant's Summary Judgment Motion

        1.      Standard

Summary judgment shall be granted if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c)(2); <u>Hersh v. Allen Products Co.</u>, 789 F.2d 230, 232 (3d Cir. 1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  "[A]t the summary judgment stage the judge's function is not...to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Id.</u> at 249.

"In making this determination, a court must make all reasonable inferences in favor of the non-movant." <u>Oscar Mayer Corp. v. Mincing Trading Corp.</u>, 744 F.Supp. 79, 81 (D.N.J. 1990) (citing <u>Meyer v. Riegel Prods. Corp.</u>, 720 F.2d 303, 307 n.2 (3d Cir. 1983), <u>cert. dismissed</u>, 465 U.S. 1091 (1984)).  However, "the party opposing summary judgment 'may not rest upon the mere allegations or denials of the...pleading'; its response, 'by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'" <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001) (quoting Fed.R.Civ.P. 56(e)); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

24

2.      **Analysis**

Defendant argues that Plaintiff cannot make out a *prima
facie* case for discrimination based on disability under NJLAD and
seeks summary judgment in its favor.  NJLAD "declares that the
opportunity to gain employment without fear of discrimination is
a civil right...." Viscik v. Fowler Equipment Co., 173 N.J. 1,
12-13 (2002).  The New Jersey Supreme Court has adopted the
burden-shifting analysis laid out by the United States Supreme
Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),
to analyze NJLAD claims.  Viscik, 173 N.J. at 13-14.

To state an unlawful discrimination claim, "a plaintiff must
show that he or she (1) belongs to a protected class; (2) applied
for or held a position for which he was objectively qualified;
(3) was...terminated from that position; and that (4) the
employer sought to, or did fill the position with a similarly-
qualified person." Id. at 14.  In a discriminatory discharge
case, such as this case, the second element of plaintiff's *prima
facie* case is met by showing that he or she was actually
performing in the position prior to his or her discharge.  Zive
v. Stanley Roberts, Inc., 182 N.J. 436, 454-55 (2005).  "[E]ven
if a plaintiff candidly acknowledges, on his own case, that some
performance issues have arisen, so long as he adduces evidence
that he has, in fact, performed in the position up to the time of

termination, the slight burden of the second prong is satisfied." Id. at 455.

"The establishment of a prima facie case gives rise to a presumption of discrimination," which shifts the burden to the employer "to articulate a legitimate, non-discriminatory reason for the adverse employment action." Viscik, 173 N.J. at 14.  If the employer succeeds in so doing, "the burden shifts back to the plaintiff to show that the employer's proffered reason was merely a pretext for discrimination."  Id.

"To prove pretext, however, a plaintiff must do more than simply show that the employer's reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent."  Id. (citing Erickson v. Marsh & McLennan Co., 117 N.J. 539, 561 (1990)).   "[A] plaintiff retains the ultimate burden of persuasion at all times; only the burden of production shifts."  Id. (citing Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 493 (1982)).

In the summary judgment context, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  Said differently,

> because the factfinder may infer from the combination
> of the plaintiff's prima facie case and its own
> rejection of the employer's proffered
> non-discriminatory reasons that the employer unlawfully
> discriminated against the plaintiff and was merely
> trying to conceal its illegal act with the articulated
> reasons..., a plaintiff who has made out a prima facie
> case may defeat a motion for summary judgment by <u>either</u>
> (i) discrediting the proffered reasons, either
> circumstantially or directly, or (ii) adducing
> evidence, whether circumstantial or direct, that
> discrimination was more likely than not a motivating or
> determinative cause of the adverse employment action.

<u>Id.</u> (internal citation omitted).

Where a "plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." <u>Id.</u> (citing <u>Anderson v. Baxter Healthcare Corp.</u>, 13 F.3d 1120, 1122-24 (7th Cir.1994); <u>Washington v. Garrett</u>, 10 F.3d 1421, 1433 (9th Cir. 1993)). However, the evidence offered by a plaintiff to rebut an employer's proffered reason for termination "must allow a factfinder reasonably to infer that <u>each</u> of the employer's proffered non-discriminatory reasons...was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." <u>Id.</u> (internal citations omitted). It is not enough for plaintiff to "show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether

discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Id. at 765.

To survive summary judgment then, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence'...." Id. (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992), cert. denied, 510 U.S. 826 (1993)). Notably, if an employer offers several reasons for its decision to terminate an employee, "the employee may need only to 'cast substantial doubt on a fair number of them.' This is because discrediting a 'fair number' of the employer's proffered reasons 'may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.'" Hood v. Pfizer, Inc., 322 Fed.Appx. 124, 127 n.1 (3d Cir. 2009)(quoting Fuentes, 32 F.3d at 764 n.7)).

### a. Plaintiff's *Prima Facie* Case

To satisfy the first element of his claim for discrimination based on disability, proof of membership in a protected group, Plaintiff must establish that he suffers from a disability

28

recognized by NJLAD.[6]  Plaintiff claims that he suffered or
suffers from a "psychiatric disorder."  Pl. Opposition to Summ.
J. Br. at 12.  NJLAD defines "disability" as including "mental,
psychological or developmental disability resulting from
anatomical, psychological, physiological or neurological
conditions which prevents the normal exercise of any bodily or
mental functions or is demonstrable, medically or
psychologically, by accepted clinical or laboratory diagnostic
techniques."  N.J. Stat. Ann. § 10:5-5(q).

        To establish that he suffered from a mental or psychological
disability, Plaintiff must demonstrate that he suffered or
suffers "(1) from any mental, psychological or developmental
disability (2) resulting from an anatomical, psychological,
physiological or neurological condition that either (a) prevents
the normal exercise of any bodily or mental functions or (b) is
demonstrable, medically or psychologically, by accepted clinical
or laboratory diagnostic techniques."  Viscik, 173 N.J. at 16.

        Plaintiff submitted an expert report offered by Dr. James B.
Hoyme, wherein Dr. Hoyme describes Plaintiff as suffering
"behavioral manifestations of what was to become an episode of
serious illness" and "functional impairments."  Pl. Ex. L in
Opposition to Summ. J.  Dr. Gruenberg also diagnosed Plaintiff as

_____

[6]     Moreover, NJLAD prohibits discrimination "against any person
because such person is or has been at any time disabled."  N.J.
Stat. Ann. § 10:5-4.1.

having "experienced an Acute Stress Disorder." Def. Ex. W in Support of Summ. J. Construing all reasonable inferences in Plaintiff's favor, the Court finds that a genuine issue of fact exists as to whether Plaintiff suffers from a disability recognized by NJLAD.

Defendant argues vigorously that it was not aware of Plaintiff's conduct relating to the March 9, 2005 incident at the time the decision was made not to renew Plaintiff's contract and that it was not aware that Plaintiff suffered from any mental condition. In support of this proposition, Defendant cites Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996) (holding that a plaintiff stating a discriminatory discharge claim pursuant to Title VII must demonstrate that the employer knew of the alleged disability) and Illingworth v. Nestle U.S.A., Inc., 926 F.Supp. 482, 484 (D.N.J. 1996) (holding that employer's knowledge of employee's handicap is an element of employee's prima facie case under NJLAD). However, Defendant concedes that the Board received Dr. Gruenberg's April 2005 reports regarding Plaintiff's mental health at the time it made the decision not to renew Plaintiff's contract. Def. Reply Br. at 10. Although Defendant maintains that no member of the Board was aware of the particulars of the March 9 incident, and that the reports reviewed concluded that Plaintiff was not suffering from mental illness, the Board's awareness of Plaintiff's mental

status presents a question for the jury.  Certainly, the fact
that the Board was reviewing mental health records at all gives
rise to the inference that Plaintiff's mental health was a
concern.  Moreover, the public nature of Plaintiff's psychotic
episode, i.e., that Plaintiff was seen crawling on the ground by
students and that Plaintiff was escorted from school grounds by
Voorhees Township Police in the presence of school
administrators, also gives rise to a reasonable inference that
the Board was aware of Plaintiff's psychotic episode.

     The testimony of Mr. Cranmer, who was told that Plaintiff
left due to mental issues, poses another hurdle for Defendant.
See Pl. Ex. T in Opposition to Summ. J. at 7:12-16; 27:18-24.
Mr. Cranmer's testimony gives rise to the reasonable inference
that Defendant's explanation for Plaintiff's dismissal is
pretextual, i.e., the same school official who told Mr. Cranmer
that Plaintiff's contract was not renewed due to problems of a
"mental nature" now takes the position that Plaintiff was
dismissed for performance reasons.  In short, the question of the
Board's awareness of Plaintiff's alleged disability must be
determined by a jury.

     The parties do not appear to dispute the remaining elements
of Plaintiff's *prima facie* case.  The record is clear that
Plaintiff had been performing in the position of Assistant
Principal/Supervisor prior to the decision not to renew his

contract for this position.  The record also suggests that the position was filled by a similarly-qualified person.  See Def. Reply Br. in Support of Summ. J. at 7 n.5.

### b.  Defendant's Proffered Reasons for the Decision Not to Renew Plaintiff's Contract

Defendant contends that the decision not to renew Plaintiff's employment contract for the Assistant Principal/Supervisor position was based on legitimate considerations of Plaintiff's performance and competency. Specifically, Defendant contends that "Plaintiff failed to fulfill the Board's legitimate expectations of competence, performance and conduct relevant to maintaining organization, discipline, safety and order in the Osage Elementary School." Def. Summ. J. Br. at 5.

Defendant also argues that the testimony of Plaintiff's superiors, Ms. Young, Mr. Brosel and Ms. Collins, demonstrate that "Plaintiff did not personify a strong leader."  Def. Summ. J. Br. at 6.  Defendant cites to several, specific incidents as supporting the decision not to renew Plaintiff's contract: Plaintiff's failure to appear for work on a day he was informed that he was in charge of the building, which left the school without an administrator; Plaintiff's failure to distribute science kits as instructed; Plaintiff's failure to give a faculty meeting presentation as instructed; Plaintiff's difficulty

32

remembering emergency procedures; and Plaintiff's failure to
complete timely, substantively adequate teacher evaluations.
Def. Summ. J. Br. at 6-10.  The record further indicates that Mr.
Brosel authored a memorandum that was submitted to the Board
listing the following reasons for his recommendation that
Plaintiff's contract not be renewed:  "Lack of demonstrated
leadership skills[;] Failure to establish an educational
leadership presence[;] Failure to follow through on specific
assignments[;] Poor to not existent decision making abilities[.]"
Def. Ex. Z in Support of Summ. J.

### c.    Plaintiff's Evidence of Pretext

Defendant's stated reasons for the non-renewal of
Plaintiff's contract shifts the burden back to Plaintiff to prove
by a preponderance of the evidence that the Board's explanation
for the non-renewal of his contract is pretextual.  <u>Fuentes</u>, 32
F.3d at 763.  As discussed above, to do so at this summary
judgment stage,[7] Plaintiff must "point to some evidence, direct
or circumstantial, from which a factfinder could reasonably
either (1) disbelieve the employer's articulated legitimate
reasons; or (2) believe that an invidious discriminatory reason

---

[7]    Of course at trial, a plaintiff must prove "that but for the
protected characteristic, the plaintiff [would not have been
terminated]."  <u>Fuentes</u>, 3d at 764 (citing <u>Hazen Paper Co. v.
Biggins</u>, 507 U.S. 604 (1993)).

was more likely than not a motivating or determinative cause of the employer's action."  <u>Fuentes</u>, 32 F.3d at 764.

Plaintiff does offer evidence from which a factfinder could reasonably disbelieve Defendant's assertions.  Plaintiff points to the two favorable performance reviews he received while working as Assistant Principal/Supervisor.  On both appraisals, Plaintiff received the highest rating given in all categories evaluated.  Although Ms. Young testified that her concerns about Plaintiff's performance began "sometime after December," Def. Ex. I in Support of Summ. J. at 86:18-19, these concerns were not articulated in her January 6 and 10 appraisals of Plaintiff's performance.  Therein, she noted that community relations "is an area of strength for [Plaintiff].  He does an outstanding job building relationships with teachers, staff and children."  Pl. Ex. I in Opposition to Summ. J.

The evaluations also state that Plaintiff's "attendance at every parent group event has helped him to establish himself within the community" and that Plaintiff "handle[d] discipline concerns frequently and effectively."  <u>Id.</u>  Construing all reasonable inferences in Plaintiff's favor, as this Court must, it finds that a factfinder could credit Plaintiff's performance appraisals so as to reasonably disbelieve that Defendant's decision not to renew Plaintiff's contract was based on his performance.

Defendant maintains that Plaintiff's failure to report to work when Ms. Young told him she would not be in the building and that he would be in charge was sufficient grounds for Plaintiff's termination.  However, Plaintiff denies ever being advised by Ms. Young that she would not be in school where she made specific request that Plaintiff be in school that day.  See Pl. Ex. S in Opposition to Summ. J. (Feb. 12, 2009 Dep.) at 33:9-19.  This is a fact that will need to be resolved by a jury.

In response to Defendant's charge that Plaintiff had difficulty remembering emergency procedures, Plaintiff testified that he did not recall having any discussions with Ms. Young regarding his performance during fire drills.  Pl. Ex. S in Opposition to Summ. J. (Oct. 29, 2008 Dep.) at 194:9-12.  Nor did Plaintiff recall ever asking anyone where he was supposed to be stationed during a fire drill.  Id. at 194:16-19.  A factfinder could credit the evaluations, which make no mention of Plaintiff's alleged difficulty with emergency procedures, and disbelieve Defendant's stated reasons.

A fact issue also exists with regard to Defendant's contention that Plaintiff failed to complete timely, substantively adequate teacher evaluations.  Although Ms. Young testified that Plaintiff failed to complete his evaluations by the March deadline, Def. Ex. I at 20:1-25, Plaintiff testified that he was never told that he was not performing evaluations in

35

a timely manner.  Pl. Ex. S in Opposition to Summ. J. (Feb. 12, 2009 Dep.) at 19:13-16.  Moreover, although Plaintiff testified that subsequent to his November 2004 evaluation, Ms. Young and Ms. Collins "together agreed [Plaintiff] need[ed] to work on [his] evaluations."  Pl. Ex. S in Opposition to Summ. J. at 179:12-19, Plaintiff later received an e-mail from Ms. Collins on December 1, 2004 stating that Ms. Collins "had a chance to review [Plaintiff's] recent evaluation report," that the report "provide[d] much mor[e] information to the teacher" and told Plaintiff to "keep up the good work!"  Pl. Ex. AA in Opposition to Summ. J.  In light of such testimony, a genuine issue of fact exists as to the adequacy of Plaintiff's evaluations.

It is noteworthy that Plaintiff concedes two of Defendant's incidents concerning his employment as Assistant Principal/Supervisor.  The first incident Plaintiff concedes is his failure to distribute science kits as instructed.  Plaintiff acknowledged that he was given "specific direction to see if the teachers were interested in this particular publisher to see if these books would be good for next year." Def. Ex. L in Support of Summ. J. at 196:10-12.  Plaintiff further acknowledged that he did not "follow the directions correctly.  I didn't have the teachers look over the books." Id. at 197:18-20.  Plaintiff dates this incident as occurring in February, after his January performance appraisals had been completed.  Pl. Response SOF ¶

36

19-20.  The second incident Plaintiff concedes is his failure to give a faculty meeting presentation as instructed.  Plaintiff acknowledged his failure to give the presentation and "and apologized [to Ms. Young] for not performing [his] duty."  Def. Ex. N. in Support of Summ. J. at 40:13-14.  Plaintiff dated the faculty meeting as occurring on March 7, 2005, two days before his psychotic episode, but well after his January performance appraisal.  Id. at 32:16-19.

These two, undisputed incidents clearly bolster the Defendant's position here.  However, Defendant has articulated that its reason for terminating Plaintiff was based on overall performance concerns and not based on either one of these two incidents alone.  Indeed, in his letter to the Board, Superintendent Brosel lists a number of reasons for his recommendation, that Plaintiff's contract not be renewed:  "Lack of demonstrated leadership skills[;] Failure to establish an educational leadership presence[;] Failure to follow through on specific assignments[;] Poor to not existent decision making abilities[.]"  Def. Ex. Z in Support of Summ. J.  Thus, because this Court has already determined that the Plaintiff has pointed to evidence from which a jury could reasonably disbelieve Defendant's reasons, these two incidents, standing alone, are insufficient to justify the grant of summary judgment.  This is particularly so because Defendant has not suggested that either

of these two incidents, or the combination of these incidents, presented sufficient grounds for termination.  Rather, Defendant has consistently maintained that Plaintiff's overall performance was the reason for its decision not to renew Plaintiff's contract.

The Court finds that, based on the record as a whole, Plaintiff has sufficiently demonstrated that a factfinder could reasonably disbelief Defendant's explanation for Plaintiff's termination.  The Court hastens to note, however, that a jury could also believe the Defendant's explanation.  In short, a jury will need to decide whether Plaintiff's performance provided sufficient grounds for his termination.[8]

### B.  Plaintiff's Summary Judgment Motion Dismissing Certain Affirmative Defenses

---

[8]     Plaintiff also offers some evidence of direct discrimination, e.g., testimony from Plaintiff's successor suggesting that he was told that Plaintiff was terminated for problems of a "mental nature."  See Pl. Ex. T in Opposition to Summ. J. at 27:10-28:3.  As noted, to survive summary judgment, Plaintiff must either show evidence from which a reasonable jury could conclude that Defendant's articulated reasons for his termination were pretext or evidence from which a reasonable jury could believe that an invidious discriminatory reason was more likely than not a motivating or determinative factor for Defendant's decision not to renew Plaintiff's contract.  See Fuentes, 32 F.3d at 764.  Because the Court finds that Plaintiff met the first prong of this test, it need not address the direct evidence of discrimination proffered by Plaintiff.

Plaintiff styles his motion seeking to bar certain affirmative defenses as a Motion for Summary Judgment.[9] Plaintiff seeks to strike Defendant's affirmative defenses based on voluntary settlement and release, estoppel and promissory estoppel, laches, failure to exhaust administrative remedies, election of remedies, waiver and failure to state a claim.[10] Because the Court finds that the sufficiency of these defenses turns on issues of material fact that must be determined by a jury, Plaintiff's motion is denied.

**IV.   CONCLUSION**

For the aforementioned reasons, Defendant's Motion for Summary Judgment is denied and Plaintiff's Motion for Summary Judgment Dismissing Certain Affirmative Defenses is also denied.

---

[9]   "Courts differ as to whether a motion for summary judgment is the appropriate procedure by which to challenge an affirmative defense." Professional Buyer's Guild, LLC v. Ace Fire Underwriter Ins. Co., Civ. No. 06-2127, 2007 WL 3227183, at *1 n.1 (D.N.J. Oct. 30, 2007) (citing United States v. Manzo, 182 F.Supp.2d 385, 395 n.6 (D.N.J. 2000) ("Because both parties refer to matters outside the pleadings and for the sake of consistency and clarity, the Court will generally treat the motion to strike as a motion for summary judgment."); Krauss v. Keibler-Thompson Corp., 72 F.R.D. 615, 616 (D. Del. 1976) ("The weight of authority and a close textual examination of the Rules convinces this Court that a motion to strike an affirmative defense can be considered only as a Rule 12(f) motion and is not a proper motion under Rule 56(d).")).

[10]   However, Defendant's counsel maintains that a Consent Order memorializing the parties' agreement to withdraw certain affirmative defenses has not been filed with the Court because it awaits Plaintiff's counsel's signature.  Def. Br. in Opposition to Summ. J. at 5.  Counsel is directed to file such order forthwith.

The parties' respective Motions to Seal are granted in part.  An appropriate Order will issue this date.


Dated: December 23, 2009      s/Renée Marie Bumb
                              RENÉE MARIE BUMB
                              UNITED STATES DISTRICT JUDGE